## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In Re:

JOSEPH DuMOUCHELLE and
MELINDA ADDUCCI,

Debtors.

Case No. 19-54531
Chapter 7
Hon. Lisa S. Gretchko

_____/

MICHAEL A. STEVENSON, CHAPTER 7 TRUSTEE AND
ASSIGNEE OF THE RIGHTS OF THOMAS RITTER,

                         Plaintiff,

v.

WILLIAM NOBLE RARE JEWELS, L.P.  and
WILLIAM NOBLE, jointly and severally,

                         Defendants.

Adv. Pro. No. 21-04041-lsg
Hon. Lisa S. Gretchko

_____/

## OPINION REGARDING DEFENDANTS' MOTION FOR
## SUMMARY JUDGMENT

### <u>Introduction</u>

Joseph DuMouchelle ("Joseph") and Melinda Adducci ("Melinda") (collectively the "Individual Debtors") are the Debtors in this Chapter 7 bankruptcy case; Michael Stevenson ("Stevenson" or "Plaintiff") is currently the Chapter 7 Trustee of their bankruptcy estate. On February 5, 2021, the complaint ("Complaint"; ECF No. 1) in this adversary proceeding ("Adversary Proceeding")

was filed against William Noble Rare Jewels, L.P. ("WNRJ") and William Noble ("Noble", and together with WNRJ, the "Defendants") seeking to recover $4.25 million that was transferred to WNRJ on February 7, 2019.

This case has been pending for nearly three years. Discovery was extended several times and concluded on September 19, 2022. On October 11, 2022, Defendants filed a motion for summary judgment ("SJ Motion"; ECF No. 90). Plaintiff filed a response ("Response"; ECF No. 92), and Defendants filed a reply ("Reply"; ECF No. 95). Oral argument on the SJ Motion was held on January 18-19, 2023, and the Court took the matter under advisement.

On January 31, 2023, Plaintiff filed a Motion for Leave to File First Amended Complaint ("Original Motion to Amend"; ECF No. 104); this motion was corrected on February 7, 2023 ("Corrected Motion to Amend"; ECF No. 107). The Corrected Motion to Amend was originally scheduled for hearing on March 17, 2023, however the parties stipulated to adjourn that hearing to April 14, 2023. Oral argument on the Corrected Motion to Amend was conducted on April 14, 2023, after which the parties engaged in mediation until October 6, 2023, when the Court determined that it was time to rule on the Corrected Motion to Amend and the SJ Motion because the parties reported at a status conference that day that they were unable to settle the case after months of trying to do so. On November 20, 2023, the Court entered an order denying the Corrected Motion to Amend (ECF No. 136).

The Court has reviewed the pleadings in this Adversary Proceeding, the SJ Motion and all briefs and exhibits submitted in connection with the SJ Motion, plus pertinent filings in the Individual Debtors' bankruptcy case and in the bankruptcy case of Joseph DuMouchelle Fine & Estate Jewellers, L.L.C. ("LLC"). The Court has also considered all statements made during oral argument on the SJ Motion.

After carefully considering the record, the Court grants (or, as applicable, recommends that the District Court grant) the SJ Motion in part and denies it in part. Pursuant to Fed.R.Bankr.P. 7056, this opinion explains the Court's reasoning.

## Jurisdiction

This Court has subject matter jurisdiction over this Adversary Proceeding under 28 U.S.C. §§ 1334(b), 157(a), 157(b) and Local Rule 83.50(a) (E.D. Mich.). Plaintiff's claims in Counts 1-4 under 11 U.S.C. §§ 548, 550, 551 and 502, are core proceedings under 28 U.S.C. § 157(b)(2)(B) and (H). Plaintiff's claims in Counts 5-7 are non-core. As to these non-core claims, therefore, this opinion states the Court's proposed findings of facts and conclusions of law, *see* 28 U.S.C. § 157(c)(1), and the Court will recommend that the United States District Court for the Eastern District of Michigan enter an order thereon. Count 8 is also a non-core claim but, because the Court has determined to deny Defendants' SJ Motion with respect to Count 8 of the Complaint, the Court has jurisdiction to enter an order to that effect.

Defendants filed a jury demand. On September 3, 2021, the parties filed a joint motion for withdrawal of the reference of this Adversary Proceeding for purposes of trial.[1] On September 28, 2021, the U.S. District Court (Judge Stephen J. Murphy, III) entered an order granting the parties' joint motion for withdrawal of the reference for trial.[2]

## Background Facts

The following facts are undisputed.

WNRJ is a jewelry company that buys and sells jewelry on consignment. Noble is one of its owners. In 2017, WNRJ began doing business with Joseph and/or the LLC.

### Defendants' Relationship with Joseph and the LLC

From the outset, Defendants observed that the transactions with the LLC and Joseph were plagued with difficulty. Nevertheless, Defendants continued to transact business with Joseph and the LLC. Indeed, there were approximately ten transactions, all of which involved Joseph's failure to follow the agreed upon

---

[1] The parties' Motion to Withdraw the Reference was transmitted to the U.S. District Court for the Eastern District of Michigan and was assigned U.S. District Court Case No. 2:21-cv-12087. Judge Murphy's Order Granting Motion to Withdraw the Reference is filed at ECF No. 29 in the Adversary Proceeding.
[2] Judge Murphy's September 28, 2021 Order administratively closed Case No. 2:21-cv-12087 and required the parties to file notice of any motions filed in this Adversary Proceeding and any decisions issued by this Bankruptcy Court in this Adversary Proceeding.

payment terms or some other difficulty in getting unsold goods back from Joseph and/or the LLC. The most significant of the transactions occurred in 2018, when Joseph asked Defendants for a variety of jewelry to sell at an exhibition. Defendants supplied Joseph and/or the LLC with jewelry worth $12.5 million for the exhibition (some owned by WNRJ and some owned by third parties who consigned them to WNRJ). Instead of selling the jewelry at the exhibition, however, Joseph and/or the LLC sold some of the jewelry at auctions for less than Noble's own cost and kept or otherwise disposed of other items.

Defendants sought to recover the jewelry that had not yet been sold. In January of 2019, WNRJ sued the LLC and Joseph in Texas state court for monetary damages and for recovery of jewelry; the counts of that complaint include breach of contract, conversion, trespass to chattels, civil theft, violations of the Texas theft liability act, fraud, fraudulent misrepresentations, fraud in the inducement, and tortious interference. Also in January of 2019, Defendants physically pursued a return of certain jewelry and sent personnel from Texas to Detroit to meet with Joseph to retrieve the unsold jewelry that did not belong to Joseph or the LLC. WNRJ even contacted police officers.

## Thomas Ritter and the Yellow Rose Diamond Transaction

Thomas Ritter ("Ritter") is a family member of Joseph and Melinda. In early 2019, they informed Ritter of a possible "investment opportunity", namely a 77.12 carat yellow diamond, called "The Yellow Rose Diamond".

Joseph told Ritter that The Yellow Rose Diamond could be purchased and then sold for a significant profit, and that they could split the profit. Joseph created fake e-mails that he sent to Ritter that appeared to be from the seller of The Yellow Rose Diamond. These e-mails included wire transfer information purportedly directing Ritter to wire the $12 million to the seller's account.

Ritter initiated three wire transfers, each in the amount of $12 million based on the bank account information provided in the emails. The first two wire transfers failed. After each of those failed attempts, Joseph provided Ritter with new and different wire transfer instructions. The third wire transfer was consummated. However, the wire transfer instructions that Joseph had provided to Ritter the third time did not include the name of an account holder. In fact, the account holder was the LLC and, consequently, Ritter wired the $12 million to the LLC's bank account, not to an account for the seller of The Yellow Rose Diamond.

The $12 million was posted to the LLC's bank account on February 6, 2019.

The very next day, on February 7, 2019, $4.25 million of that $12 million was transferred from the LLC's Bank of America account to WNRJ.[3]

Unbeknownst to Ritter at the time he wire transferred $12 million to the LLC's bank account, WNRJ (or Noble) owned The Yellow Rose Diamond. Joseph attempted to gain access to The Yellow Rose Diamond. However, Defendants would not consign it to him.

Joseph was charged criminally in U.S. District Court Case 20-20245 for his role in The Yellow Rose Diamond transaction. He pled guilty and is currently incarcerated.

### Joseph and Melinda File Bankruptcy

On October 11, 2019, Joseph and Melinda filed a voluntary Chapter 11 petition. On December 4, 2019, their bankruptcy case was converted to a Chapter 7 bankruptcy case. Fred Dery was appointed to serve as the Chapter 7 Trustee and charged with the duty to administer assets of the Individual Debtors' bankruptcy

---

[3] Exhibit 6.K to the SJ Motion is a copy of the LLC's Bank of America account statement (ending in 0585) for the period February 5-28, 2019. The "Deposit and other credits" section of that account statement shows a $12 million wire transfer from Ritter to the LLC's bank account on February 6, 2019. The "Withdrawals and other debits" section of that same bank account statement shows a $4.25 million transfer on February 7, 2019 to an account ending in 9283. During Noble's September 9, 2022 deposition in this Adversary Proceeding, he testified that the account ending in 9283 was a corporate account for WNRJ at Bank of America into which the $4.25 million was deposited (See pg. 78 of Noble's deposition testimony, attached as Exhibit 6A to Defendants' SJ Motion, ECF No. 90).

estate. When Mr. Dery died in 2021, the United States Trustee appointed Stevenson as the successor Chapter 7 Trustee of the Individual Debtors' bankruptcy estate.

### Involuntary Bankruptcy Is Filed Against the LLC

On November 17, 2019, East Continental Gems, Inc., Ritter, and WNRJ filed an involuntary Chapter 7 bankruptcy petition against the LLC. On December 16, 2019, the Court entered the Order for Relief, and Mark Shapiro was appointed to serve as the Chapter 7 Trustee and charged with the duty to administer assets of the LLC's bankruptcy estate.

### Ritter's Motions for Relief from the Automatic Stay

On October 18, 2020, Ritter filed motions for relief from the automatic stay ("Stay Relief Motions") in both the Individual Debtors' bankruptcy case (Case No. 19-54531; ECF No. 298) and in the LLC's bankruptcy case (Case No. 19-56239; ECF No. 178) seeking to sue WNRJ and Noble in state court to recover the $4.25 million that Ritter alleged had been paid to them out of "his" $12 million.

Collectively, Ritter's Stay Relief Motions drew objections from the Chapter 7 Trustee of the Individual Debtors' bankruptcy estate, the Chapter 7 Trustee of the LLC's bankruptcy estate, and from WNRJ.

A compromise of Ritter's Stay Relief Motions was negotiated. Each of the Chapter 7 Trustees sought (and obtained) bankruptcy court approval of the

compromise (collectively, the "Compromise Motions").[4] WNRJ was served with notice of both of the Compromise Motions and did not object or otherwise respond to either of them.

On January 12, 2021, the Court entered an order granting Fred Dery's Motion to Compromise Claims (Case No. 19-54531; ECF No. 345). On February 12, 2021, the Court entered the order granting Mark Shapiro's Motion to Compromise Claims (Case No. 19-56239; ECF No. 220). Both of these orders (collectively, the "Compromise Orders") were obtained via the Compromise Motions, and the Court entered the Compromise Orders upon certificates of no response filed by the Trustees in their respective cases. Both Compromise Orders authorized Fred Dery, as Chapter 7 Trustee of the Individual Debtors' bankruptcy estate, to file an adversary proceeding against WNRJ and William Noble pursuant to, *inter alia,* 11 U.S.C. §§ 544, 548, 550 and 551, and reserved for a later date the determination of the extent of each bankruptcy estate's interest in the underlying claims and how the funds recovered should be distributed as between the two bankruptcy estates. The compromise order entered in the Individual Debtors' case also included the following provision:

---

[4] In the Individual Debtors' bankruptcy case, Fred Dery filed a Motion for Authority to Compromise Claims (Case No. 19-54531, ECF No. 331). In the LLC's bankruptcy case, Mark Shapiro filed a Motion for Authority to Compromise Claims (Case No. 19-56239, ECF No. 206).

8. Nothing in this order shall have any preclusive or determinative effect regarding the claims to be asserted against Noble.

## Commencement of This Adversary Proceeding

On February 5, 2021, Fred Dery (as Trustee of the Individual Debtors' estate and as assignee of Ritter) filed the Complaint in this Adversary Proceeding against WNRJ and Noble. In 2021, Fred Dery died. The United States Trustee appointed Stevenson as the successor Chapter 7 Trustee in the Individual Debtors' bankruptcy case, and he became the Plaintiff in this Adversary Proceeding ("Plaintiff").

Mark Shapiro, as Trustee of the LLC estate, is not a party in the Adversary Proceeding nor did he assign claims of the LLC estate to Plaintiff. The Complaint does not pursue any causes of action on behalf of the LLC's bankruptcy estate.

## <u>Matters Acknowledged During Oral Argument on the SJ Motion</u>

During oral argument on the SJ Motion, the parties acknowledged the following:

1. Plaintiff is pursuing Counts 1-4 in his capacity as Trustee of the Individual Debtors' bankruptcy estate;

2. Plaintiff is pursuing Counts 5-8 in his capacity as assignee of Ritter;

3. Ritter wire transferred $12 million to the LLC's bank account on February 6, 2019;

4. Because Ritter voluntarily transferred the $12 million to the LLC bank account (albeit based on Joseph's fraud), under applicable law[5] voidable title to the $12 million passed from Ritter; and

5. $4.25 million of the $12 million from Ritter was transferred from the LLC's bank account to WNRJ's bank account on February 7, 2019.

Although Plaintiff acknowledges that, under applicable law, voidable title to the $12 million passed from Ritter when he voluntarily transferred the $12 million to the LLC bank account, a dispute remains as to who—as between the LLC and Joseph—received the voidable title that passed from Ritter. Defendants argue that voidable title passed to the LLC because the $12 million was wired to the LLC's bank account. Plaintiff argues that voidable title passed to Joseph because he merely used the LLC's bank account to "funnel" the $12 million obtained through his defrauding Ritter.

**Summary Judgment Standard and Burden of Proof**

Under Fed.R.Civ.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion

---

[5] The parties acknowledge that *In re Newpower,* 233 F.3d 922 (6th Cir. 2000) and *People v. Malach,* 202 Mich. App. 266 (1993) apply and establish this proposition.

to "properly address another party's assertion of fact as required by Rule 56(c)." Fed.R.Civ.P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Anderson,* 477 U.S. at 249. "The moving party discharges its burden by 'showing— that is, pointing out to the … court—that there is an absence of evidence to support the nonmoving party's case.'" *Horton v. Potter,* 369 F.3d 906, 909 (6th Cir. 2004). The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369 F.3d at 909. Summary judgment is not appropriate when the evidence "presents a sufficient disagreement to require submission to a jury." *Anderson,* 477 U.S. at 251-52. Viewing the evidence in the light most favorable to the opposing party, the court may grant summary judgment only if the evidence is so one-sided that a reasonable factfinder could not find for the opposing party. *See, Anderson,* 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989).

## I.     Defendants Are Entitled to Summary Judgment on Counts 1-4

It is undisputed that Plaintiff is pursuing Counts 1-4 of the Complaint in his capacity as Trustee of the Individual Debtors' bankruptcy estate. Count 1 of the Complaint seeks to avoid as a fraudulent transfer (under 11 U.S.C. § 548) the $4.25 million that was transferred to WNRJ. Count 2 seeks to recover the avoided transfer. Count 3 seeks to preserve it for the benefit of the Individual Debtors' bankruptcy estate. Count 4 seeks to disallow WNRJ's claim against the Individual Debtors' bankruptcy estate until Defendants repay the avoided transfer to the bankruptcy estate. These four counts rely on 11 U.S.C. §§ 548, 550, 551 and 502(d), respectively, and they are all "linked" so that if Count 1 is dismissed, Counts 2, 3 and 4 must also be dismissed.

Count 1 of the Complaint quotes 11 U.S.C. § 548. That statute permits a bankruptcy trustee to avoid a transfer of "an interest of the debtor in property." Thus, in order for Plaintiff to prevail on Counts 1-4, he must prove that the Individual Debtors had an interest in the $4.25 Million that the LLC transferred to WNRJ. Defendants argue that Counts 1-4 must be dismissed because Plaintiff cannot prove that the transfer at issue in this case was of "an interest of the debtor in property"—i.e., an interest of the Individual Debtors.

Plaintiff raises three arguments in response. First, Plaintiff asserts that the compromise order in the Individual Debtors' bankruptcy case constitutes a "dispositive ruling" that the Individual Debtors' bankruptcy estate has an interest in the $12 million that Ritter wired to the LLC's bank account. Plaintiff is mistaken. The Compromise Motions sought to resolve the Stay Relief Motions filed by Ritter and did not determine which bankruptcy estate had an interest in the funds at issue in this Adversary Proceeding or in the underlying claims. In connection with the entry of the Compromise Orders, Mark Shapiro (as Trustee of the LLC bankruptcy estate) and Fred Dery (as then Trustee of the Individual Debtors' bankruptcy estate) specifically agreed to language that reserved for a later date any determination of the interests of the respective bankruptcy estates in the funds recovered in this Adversary Proceeding and in the underlying claims.[6] The Compromise Orders do not constitute any ruling on those issues, much less a "dispositive" one. While the Compromise Orders authorized Plaintiff to bring this Adversary Proceeding, they did not determine that the Individual Debtors' bankruptcy estate had any interest in the funds in question. Mark Shapiro did not join this Adversary Proceeding as a

---

[6] See Motion for Entry of Order Authorizing Trustee To Compromise Claims filed in the LLC case, Certificate Of Non-Response, and order granting that motion (Case No. 19-56239, ECF Nos. 206, 219, and 220, respectively) and Motion for Entry of Order Authorizing Trustee To Compromise Claims filed in the Individual Debtors' case, Certificate Of No Response, and order granting that motion (Case No. 19-54531, ECF Nos. 331, 340, and 345, respectively).

plaintiff, nor did he assign any claims of the LLC's bankruptcy estate to Plaintiff.

Even though the transfer at issue in Counts 1-4 of this Adversary Proceeding came

from the LLC's bank account, the Complaint does not pursue any causes of action

on behalf of the LLC's bankruptcy estate. Ultimately, the Compromise Orders do

not establish or determine that the Individual Debtors' bankruptcy estate had any

interest in the funds described in this Adversary Proceeding.

Second, Plaintiff argues that Defendants' failure to object to the Compromise

Motions constitutes their agreement with the Compromise Orders and/or

Defendants' waiver of any challenges. This argument misses the mark. The

compromise order in the Individual Debtors' bankruptcy case does not constitute a

ruling on any substantive issue and, instead, preserves for a later date the

determination as to the extent of each bankruptcy estate's interest in the claims

underlying the litigation. Indeed, the compromise order entered in the Individual

Debtors' bankruptcy case states:

> 8.      Nothing in this order shall have any preclusive or determinative
> effect regarding the claims to be asserted against Noble.

Consequently, Defendants were not required to object to the Compromise Motions

in order to preserve their right to argue that Plaintiff lacks an interest in the $4.25

million that was transferred to WNRJ.

Third, Plaintiff argues that the legal fiction of a corporate "separateness" from

its stockholders/members only exists to serve the ends of justice and, because the

LLC was an instrumentality of Joseph's fraudulent (indeed, criminal) activity and was used to "subvert justice" in this instance, the law requires the Court to ignore the corporate entity so that some or all of the property of the LLC "becomes" the property of the Individual Debtors. Plaintiff does not identify any authority to support the legal theory by which property of the LLC (or its bankruptcy estate) simply *becomes* property of the Individual Debtors (or their bankruptcy estate).

Defendants assert that Plaintiff's arguments are procedurally improper and inconsistent with Michigan law. The Court agrees with Defendants.

First, Plaintiff's argument is procedurally improper because the Complaint does not contain any allegation of alter ego, veil piercing, reverse veil piercing, or the like. At no time during the course of discovery did Plaintiff seek to amend the Complaint to allege any of these theories; instead, Plaintiff filed the Original Motion to Amend on January 31, 2023—weeks after oral argument on Defendants' SJ Motion and more than sixteen months after the September 15, 2021 deadline to amend pleadings.  Discovery closed on September 19, 2022. In other words, in response to Defendants' SJ Motion, Plaintiff has raised the concept of "ignoring corporate separateness" without having addressed that legal theory in the Complaint and without having ever amended the Complaint prior to the close of discovery to include an allegation of alter ego, veil piercing, reverse veil piercing, etc. Consequently, as the parties acknowledged during oral argument on the Corrected

Motion to Amend, neither side took discovery to establish (or refute) those legal theories and their requirements.

Second, Plaintiff's argument about ignoring corporate separateness is inconsistent with Michigan law. While the theory of veil piercing makes an individual liable to corporate creditors and reverse veil piercing makes a corporation liable for shareholder's obligations, these veil piercing theories only pertain to *liability*. Defendants correctly note that this Adversary Proceeding is not about liability. Joseph is already incarcerated for his criminal fraud that lured Ritter into wiring $12 million to the LLC's bank account.

Instead, this Adversary Proceeding is about *property*—namely the avoidance and recovery of the $4.25 million that was transferred from the LLC's bank account to WNRJ. Plaintiff—as Trustee of the Individual Debtors' bankruptcy estate—has provided no authority for his argument that the LLC's property should be treated as property of the Individual Debtors (or their bankruptcy estate).

As Judge Applebaum recently noted in *In re Silver,* 647 B.R. 897, 909-10 (Bankr. E.D. Mich. 2022), there are two "camps" on whether the law allows litigants to use veil piercing to consolidate two entities. Michigan falls into the "second camp", which permits veil piercing with respect to liability but does not transform the "alter ego's" property into the property of the debtor. Judge Applebaum held:

Even if Great Lakes were successful in prosecuting alter ego or veil piercing claims, under Michigan law the assets of Silver's Jewelry and Loan would not be consolidated with Jason Silver's estate. Without consolidation, the fraudulent transfer claims against Gold belonging to Silver's Jewelry and Loan—the prize the Trustee seeks—do not become the property of Jason Silver's estate.

*Id.* at 910.

Judge Dales reached the same conclusion in *In re Przybysz,* 2012 Bankr.

LEXIS 6333 at *21 (Bankr. W.D. Mich. Nov. 29, 2012) stating:

So, even assuming the Trustee had standing to invoke the alter ego doctrine, either as the Debtor's successor under 11 U.S.C. §541 or the representative of creditors under §544(a), the doctrine would not permit the court to treat the Related Entities' property as the Debtor's such that the Trustee could then pursue the Defendants in these proceedings.

As the Sixth Circuit Court of Appeals noted in *In re Howland,* 674 F. App'x

482, 485 (6th Cir. 2017), the issues of veil piercing and reverse veil piercing depend

on state law. In *Howland*, the Sixth Circuit considered veil piercing under Kentucky

law, which (like Michigan) falls into the "second camp". The Sixth Circuit

summarized the second camp approach as follows:

Under this approach, "[t]he doctrine of alter ego does not create assets for or in the corporation. It simply fastens liability upon the individual who uses the corporation merely as an instrumentality in the conduct of his own personal business."

*Id.* at 486 (Internal citations omitted). The Sixth Circuit then held that:

Because Kentucky veil piercing does not transform the alter ego's property into property of the debtor, but rather simply allows a creditor to pursue the alter ego under a vicarious liability theory, the trustee has

18

not stated a claim under § 544 and § 548, both of which require that *the debtor* have an interest in the transferred property.

*Id.* at 487 (Emphasis in original).

The same is true under Michigan law. Piercing a corporate veil is an equitable remedy. *Florence Cement Co. v. Vettraino*, 292 Mich. App. 461, 468 (2011). "With specific respect to liability pertaining to the debts or obligations of an LLC, however, under certain circumstances, it is appropriate for courts to disregard the corporate entity and 'pierce the corporate veil.'" *Simon v. Gebremariam*, No. 353312, 2020 WL 10142203, at *5 (Mich. Ct. App. Dec. 10, 2020).

It is undisputed that voidable title to the $12 million passed from Ritter when he wired that amount to the LLC's bank account. It is undisputed that the LLC's bank account received the $12 million from Ritter. As a matter of law, the name on the bank account is *prima facie* evidence that the funds in the account are owned by the person or entity whose name is on the account. *Medilink Ins. Co. v. Comerica Bank,* 2011 U.S. Dist. LEXIS 30203, at *19 (E.D. Mich. March 23, 2011). Plaintiff has not provided any evidence to refute Defendants' assertion that the LLC owned the funds in its bank account. Instead—after discovery has closed—Plaintiff now relies on unpled legal theories to argue that "corporate separateness" should be

ignored and that the $12 million in the LLC's bank account really belonged to Joseph.

At this summary judgment stage, the Court must determine if the evidence produced creates a genuine issue for trial. *Anderson*, 477 U.S. at 249. Defendants— as the moving parties—have discharged their burden in this SJ Motion by pointing out to the Court that there is an absence of evidence to support Plaintiff's case. *Horton,* 369 F.3d at 909. Plaintiff—as the non-moving party—must put forth enough evidence to show that there exists "a genuine issue for trial." *Id.* In other words, Plaintiff must point to evidence to show that a "genuine issue for trial" exists as to whether the $12 million in the LLC's bank account ($4.25 million of which was transferred to WNRJ) really belonged to Joseph.

Plaintiff has not provided any evidence on this issue and, instead, relies on legal theories that it did not assert in the Complaint.

Consequently, the Court finds that there is no genuine issue for trial and that the voidable title to the $12 million that passed from Ritter passed to the LLC. It is undisputed that $4.25 million of that $12 million was transferred from the LLC's bank account to WNRJ. Because the Individual Debtors did not have an interest in that $4.25 million, Counts 1-4 of the Complaint must be dismissed.

## II. The Court Will Recommend That Summary Judgment Be Granted in Defendants' Favor on Counts 5-7

It is undisputed that Plaintiff is pursuing Counts 5-7 in his capacity as assignee of Ritter. In other words, Counts 5-7 are Ritter's causes of action that have been assigned to Plaintiff.

Count 5 is titled "Unjust Enrichment/Constructive Trust", Count 6 is titled "Common Law Money Had and Received (Texas Law)", and Count 7 is titled "Common Law Conversion".

The Complaint was filed on February 5, 2021—long before the January 18-19, 2023 oral argument on the SJ Motion at which Plaintiff conceded that, under applicable law, voidable title to the $12 million passed from Ritter on February 6, 2019, when he voluntarily made the wire transfer (albeit in response to Joseph's fraud). Once Plaintiff acknowledged that voidable title to the $12 million passed from Ritter, Counts 5-7 became obsolete and unsustainable because they are all predicated on the notion that the $12 million "belongs" to Ritter. Although Plaintiff argues that, in this Adversary Proceeding, the Court can simply "void" the voidable title that passed from Ritter to the LLC, that argument fails and is procedurally improper. The LLC is not a party to this Adversary Proceeding, nor does the Complaint include any count asking the Court to determine who has title to the $12 million *as between Ritter and the LLC*.

Moreover, Defendants did not defraud Ritter, nor did they receive or take funds *from Ritter*. Instead, WNRJ received $4.25 million from the LLC toward payment for the debt owed to WNRJ. Plaintiff has not provided any authority for the ability to bring a cause of action for unjust enrichment/constructive trust, money had and received, or common law conversion against a third-party or downstream transferee that receives funds acquired through fraud or false pretenses perpetrated by another party.

Because Plaintiff (in his capacity as assignee of Ritter) now acknowledges that voidable title to the $12 million passed from Ritter, the predicate of Counts 5-7 has disappeared. Consequently, the Court will recommend to the United States District Court that Counts 5-7 be dismissed.

### III. Defendants are Not Entitled to Summary Judgment on Count 8

Count 8 is titled "Statutory Conversion (MCL 600.2919(a))". It is undisputed that Plaintiff is pursuing Count 8 in his capacity as assignee of Ritter. In other words, Count 8 is Ritter's cause of action that has been assigned to Plaintiff.

MCL 600.2919a states:

(1)     A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
    (a)     Another person's stealing or embezzling property or converting property to the other person's own use.
    (b)     Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the

concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2)     The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Although the allegations within Count 8 only reference conversion, the title of Count 8 clearly identifies the statute—MCL 600.2919a.  The Court finds that this citation to the statute, coupled with Count 8's incorporation of all of the preceding allegations in the Complaint, gave Defendants sufficient notice that Count 8 could invoke other parts of MCL 600.2919a, such as receiving stolen property.  During oral argument on the SJ Motion, Defendants argued that, even if the Court finds that the $12 million that Ritter wired to the LLC bank account can be considered "stolen property", Plaintiff is unable to prove that Defendants had actual knowledge thereof, which is required under MCL 600.2919a(1)(b). In other words, Defendants' oral argument on the SJ Motion already addressed both MCL 600.2919a(1)(a) and (1)(b). Thus, to the extent Count 8 of the Complaint may have been unclear about which subsection(s) were pled, the Court finds that Count 8 invokes MCL 600.2919a in its entirety.

Statutory conversion is different from common law conversion. Unlike common law conversion, statutory conversion extends liability to those dealing in stolen property.  It also requires actual knowledge of the underlying conversion, embezzlement or theft before liability attaches. *See, e.g., Medilink Ins. Co. v. Comerica Bank,* 2011 U.S. Dist. LEXIS 30203, at *31 (E.D. Mich. March 23, 2011)

and *Echelon Homes, L.L.C. v. Carter Lumber, Co.,* 472 Mich. 192, 200 (2005). So, even though the conversion allegations in Count 7 of the Complaint should be dismissed for the reasons described above, statutory conversion under MCL 600.2919a requires a separate analysis.

The possible application of MCL 600.2919a to the facts of this case raises two issues. First, can the $12 million that Ritter wired to the LLC's bank account be considered stolen, embezzled or converted property for purposes of MCL 600.2919a? If the answer is "no", then Count 8 must be dismissed. However, if the answer is "yes", then the Court must then consider whether Defendants' SJ Motion should be granted with respect to Count 8 of the Complaint.

The first issue requires an analysis of the case law. In *In re Newpower*, 233 F.3d 922, 929 (6th Cir. 2000), the Sixth Circuit Court of Appeals observed that Michigan law (as set forth in *People v. Malach,* 202 Mich. App. 266 (1993)) differentiates between larceny crimes and obtaining money by false pretenses. Consequently, this Court needs to determine whether the facts of this case constitute a "larceny crime" or "obtaining money by false pretenses". In *Malach,* 202 Mich. App. at 270-71, the Michigan Court of Appeals explained:

> In *People v. Long,* 409 Mich. 346, 294 N.W. 2d 197 (1980), our Supreme Court explained the historical difference between the crimes of larceny and obtaining money by false pretenses:
>
> > "*In larceny, the owner of the thing stolen has no intention to part with his property therein; in false pretenses, the owner*

*does intend to part with his property in the thing, but this intention is the result of fraudulent contrivances.* If the owner did not part with his property in the thing, but simply delivered the possession, the ownership remaining unchanged, for the purpose of having the person to whom the property was delivered use it for a certain special and particular purpose, for the owner, the title would not pass, and its felonious conversion would be larceny. A distinction is made between a bare charge for special use of the thing, and a general bailment; and *it is not larceny if the owner intends to part with the property and deliver the possession absolutely, although he has been induced to part with the goods by fraudulent means.* If, by trick or artifice, the owner of property is induced to part with the possession to one who receives the property with felonious intent, the owner still meaning to retain the right of property, the taking will be larceny; but *if the owner part with not only the possession, but right of property also, the offense of the party obtaining the thing will not be larceny, but that of obtaining the goods by false pretenses."*

The distinction between the two offenses … depends entirely upon the intent of the victim; if the owner of the goods intends to keep title but part with possession, the crime is larceny; if the owner intends to part with both title and possession, albeit for the wrong reasons, the crime is false pretenses.

(Emphasis in original; internal citations omitted).

In the instant case, Ritter ordered the wire transfer of $12 million dollars three separate times. He intended to part with both title and possession of the $12 million, (albeit due to Joseph's fraud) to purchase The Yellow Rose Diamond. Thus, under *Long* and *Malach,* the instant case involves obtaining money through false pretenses, not larceny. Consequently, this Court must determine whether the $12 million

obtained from Ritter through false pretenses ($4.25 million of which was transferred to WNRJ) constitutes "stolen property" for purposes of MCL 600.2919a.

In deciding the issue, this Court notes that this is not a situation in which the facts are unclear as to who defrauded Ritter or how the fraud occurred. Joseph is incarcerated for his fraud in The Yellow Rose Diamond transaction.

There is authority for the proposition that the phrase "stolen property" as used in MCL 600.2919a is broad enough to include money obtained through false pretenses. In *Shiffman v. Auto Source Wholesale, LLC,* 2018 WL 3863471 at *1 (Mich. Ct. App. Aug. 14, 2018), Shiffman agreed to loan $250,000 to the defendants who were purportedly having "cash flow issues". In order to acquire the $250,000 from Shiffman, one of the defendants, Mr. Katz, said that he would guarantee the loan with funds from the Katz Trust and fraudulently claimed that there was a $471,789.41 balance in the Katz Trust. In reality, the balance in the Katz Trust was 13 cents. When it came time for repayment, the defendants failed to do so. Rather, Katz had used much of the $250,000 from Shiffman to pay for personal expenses and to repay other Auto Source Wholesale, LLC debts.

Shiffman sued the defendants alleging, among other things, breach of contract, common law fraud and statutory stealing under MCL 600.2919a. The trial court denied Shiffman's motion for summary disposition on the count of his complaint relating to MCL 600.2919a. Shiffman appealed and, in a two-to-one

decision (with a dissenting opinion by Judge O'Brien), the Michigan Court of

Appeals reversed the lower court and granted Shiffman summary disposition on his

claim under MCL 600.2919a, stating:

> We further agree with plaintiff that he was entitled to summary
> disposition on his statutory stealing claim. MCL 600.2919a does not
> define "stealing" for purposes of the statute. When interpreting
> statutory language, this Court must ascertain the legislative intent that
> may be reasonably inferred from the words expressed in the statute and
> we may consult dictionary definitions to do so. *Alken-Ziegler, Inc., v.
> Hague,* 283 Mich. App. 99, 102-103; 767 N.W.2d 668 (2009). Where
> a "statute uses a common-law term of established meaning without
> otherwise defining it, the general practice is to give that term its
> common-law meaning. But 'stolen' (or 'stealing') has no accepted
> common-law meaning." *United States v. Turley,* 352 U.S. 407, 411; 77
> S. Ct. 397; 1 L. Ed. 2d 430 (1957). Because there is no common-law
> meaning of the word "steal", we give it the meaning consistent with the
> context in which it appears. *Id.* at 412-13. When a statutory term is
> undefined, dictionary definitions may be consulted. *Id.* The *Turley*
> court referenced *Black's Law Dictionary* (4th ed) to define stealing as
> "the criminal taking of personal property either by larceny,
> embezzlement, or false pretenses." *Turley,* 352 U.S. at 413. Also in
> that case, the U.S. Supreme Court cautioned "we should give 'stolen'
> the meaning consistent with the context in which it appears." *Id.*
>
> ***
>
> Clearly, defendants had the intent to keep the money unlawfully, or
> "steal" it, as demonstrated by the evidence that Katz knew that the funds
> in the Katz Trust were not sufficient to pay plaintiff back $250,000. In
> essence, Katz stole plaintiff's money by false pretenses. "False
> pretenses" is defined as "[t]he crime of knowingly obtaining title to
> another person's personal property by misrepresenting a fact with the
> intent to defraud." *Black's Law Dictionary* (10th ed.). The Michigan
> Penal Code defines "false pretenses" as including, but not limited to:
>
> > [A] false or fraudulent representation, writing, communication,
> > statement, or message, communicated by any means to another

person, that the maker of the representation, writing, communication, statement, or message knows is false or fraudulent. The false pretense may be a representation regarding a past or existing fact or circumstance or a representation regarding the intention to perform a future event or to have a future event performed. [MCL 750.218(11).]

*** 

The dissent seems to conclude that Katz rightfully took plaintiff's money rather than characterizing his action as a misappropriation for a purpose for which the plaintiff did not give him permission to do. However, the record shows the defendant falsely took plaintiff's money and used it for personal and other expenses unrelated to the "loan" agreement purpose which was to utilize the $250,000 for defendant's used car dealership so that it could "secure financing from Next Gear Capital to purchase vehicles." This was a taking without having permission or the right to do so. Thus, defendants' conduct fits within the dissent's preferred definition of "steal" and amounts to a violation of MCL 600.2919a.

*Id.* at *3-5.

Consistent with the majority opinion in *Shiffman,* this Court concludes that the phrase "stolen property" as used in MCL 600.2919a is broad enough to include money obtained through false pretenses.[7] Consequently, the Court finds that the $12

---

[7] In *People v. Pratt,* 254 Mich. App. 425 (2002), the Michigan Court of Appeals interpreted the words "stolen property" in MCL 750.535(3)(a). *Pratt* involved a stolen car. The defendant asserted that he borrowed the car; the former girlfriend testified that he took her car without permission. The Michigan Court of Appeals held:

> With regard to whether the car was stolen, defendant asserts that there was no evidence presented that he intended to permanently deprive the owner of her car. Defendant's argument hinges on his assertion that for the property to be "stolen," it must have been taken by larceny and,

28

million that Ritter wire transferred to the LLC's bank account based upon Joseph's

fraud constitutes "stolen property" for purposes of MCL 600.2919a, and that the

---

> thus, taken with the intent to permanently deprive the owner of possession.  Defendant is correct that a larceny requires that the property must be taken with such an intent. … However, we find that the statute concerns any property taken without permission, not only property taken by larceny.
>
> MCL 750.535(3) requires that a defendant must have possessed stolen goods.  However, the statue does not define "stolen".  In the absence of statutory defining of a term, this Court may consult dictionary definitions to determine the common meaning of the term.  *Random House Webster's College Dictionary* (2000) defines "steal" as "to take (the property of another or others) without permission or right, esp. secretly or by force," and "to appropriate … without right or acknowledgement." For goods to be considered stolen under this definition, they need only be taken without permission or right; thus, "stolen" goods encompass a broader category than just goods taken by larceny."

*Pratt,* 254 Mich. App. 427-28 (Citations omitted).

This is consistent with *Lake v. United States,* 338 F.2d 787, 788-789 (10th Cir. 1964), in which the Tenth Circuit interpreted the word "stolen" (as used in the National Motor Vehicles Theft Act). The 10th Circuit held:

> It is now well-settled that 'stolen' as used in this statute includes 'all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny.' Thus, a felonious taking may be effected by diverse means known to both common and statutory law, such as larceny, embezzlement, false pretenses, larceny by trick and other types of wrongful acquisition.

$4.25 million thereof that was transferred to WNRJ also constitutes "stolen property" for purposes of MCL 600.2919a.

Still, Defendants argue that MCL 600.2919a requires Plaintiff to prove that Defendants had "actual knowledge" that the $4.25 million was stolen property, and that the SJ Motion should be granted with respect to Count 8 of the Complaint because Plaintiff has not produced any evidence showing that Defendants had "actual knowledge". In response, Plaintiff argues that Noble's own deposition testimony (excerpts of which were attached to pleadings filed by both sides in connection with the SJ Motion) constitutes evidence of Defendants' actual knowledge due to Joseph's pattern of behavior with Defendants (over some ten transactions), and the lengths that Defendants went to in order to recover funds and jewelry from Joseph and/or the LLC.

However, MCL 600.2919a requires Plaintiff to prove that Defendants knew that *this* $4.25 million transferred by the LLC to WNRJ was stolen property. *Echelon Homes, L.L.C. v. Carter Lumber Co.,* 472 Mich. 192, 200 (2005). Neither Defendants' knowledge about Joseph's bad acts in connection with other jewelry transactions, nor proof that Defendants should have known that the $4.25 million was stolen property, is sufficient for purposes of MCL 600.2919a. *Echelon,* 471 Mich. at 197-200.

Yet, Plaintiff correctly notes that, under MCL 600.2919a circumstantial evidence can be used to prove Defendants' actual knowledge. *Echelon,* 472 Mich. at 200.

At this summary judgment stage, the issue is whether the evidence is so one-sided that a reasonable jury could not find in favor of Plaintiff as to WNRJ's actual knowledge that the funds were stolen. Drawing inferences in favor of the non-movant, Plaintiff, the Court determines that the evidence is not so one-sided and that there is a genuine dispute of material fact as to whether the circumstances support the contention that Noble and WNRJ knew the funds were stolen.

Defendants vigorously pursued the LLC and Joseph—including a Texas state court lawsuit against both of them for, *inter alia,* civil theft and violations of the Texas theft liability act. Defendants sent personnel from Texas to Detroit in late January 2019 to catch up with Joseph and physically retrieve jewelry that did not belong to Joseph or the LLC and also contacted the police. Noble's deposition testimony in this Adversary Proceeding shows a pattern on Joseph's part of failing to comply with the terms of deals, not paying as required, and making representations that apparently were not truthful, yet Defendants continued to deal with the LLC and Joseph. Even Noble uses the word "stolen" during his deposition to describe the LLC's and/or Joseph's antics regarding various items of jewelry. (See

pg. 65 of Noble's deposition testimony, attached as Exhibit 1 to Plaintiff's Brief in Response to the SJ Motion, ECF No. 92).

The facts of the instant case are significantly different from the facts in *Medilink Ins. Co. v. Comerica Bank,* 2011 U.S. Dist. LEXIS 30203, at *35-36 (E.D. Mich. March 23, 2011), in which the District Court (Judge Cleland) granted summary judgment in favor of Comerica Bank after finding that there was not sufficient evidence to allow a reasonable jury to find that Comerica Bank knew the money at issue in that case was "stolen" when deposited into the accounts at Comerica Bank. On the facts of the instant case, however, the Court concludes that Plaintiff has presented sufficient evidence (albeit circumstantial evidence, which is permissible under *Echelon,* 472 Mich. at 200) to demonstrate a genuine issue of material fact as to whether Defendants knew that the $4.25 million that was transferred to WNRJ was stolen property. Consequently, Defendants' motion for summary judgment on Count 8 must be denied.

Additionally, because MCL 600.2919a refers to the actions of "another person" and does not require the funds to have gone into the possession of the other person, Noble cannot be dismissed from this Adversary Proceeding even though it is undisputed that the $4.25 million went into the bank account of WNRJ.

## Conclusion

For the reasons stated in this opinion, the Court will enter an order granting Defendants' SJ Motion as to Counts 1-4 of the Complaint and denying Defendants' SJ Motion as to Count 8 of the Complaint. The Court will recommend that the United States District Court enter an order dismissing Counts 5-7 of the Complaint.

**Signed on November 21, 2023**



/s/ Lisa S. Gretchko

**Lisa S. Gretchko**
**United States Bankruptcy Judge**